The next matter is Debenedictis v. Merrill Lynch&Co. Mr. Malone. Good morning, Your Honor. Good morning. May it please the Court, my name is James Malone and I speak this morning on behalf of the plaintiff, Thomas DeBenedictis. Before we start, I just want to make sure I understand something. We're focused today on the inquiry notice issue. It's my understanding, I think the district court at the end of his opinion said that with respect to whether the plaintiff exercised any due diligence, which would have been the second part of the inquiry, that you had not presented any evidence of that. Am I correct about that, that that's not? No, that's not part of this case. That's correct, Your Honor. Okay, good. So we're completely focused on inquiry notice. Before I leave the area, can I reserve two minutes for purposes of the brawl? You may. Thank you. In this case, I would submit, Your Honor, that the district court should be reversed because it construed the concept of inquiry notice too broadly. And also because the alternate grounds that have been proffered by the defendants here won't bear the weight that they tried to thrust upon them. The standard for inquiry notice under the securities laws, and also under RICO, is whether the facts that are available to an ordinary reasonable investor are such that they would recognize the probability of wrongdoing. Not suspicion, not the possibility, but the probability, the likelihood that someone that they dealt with had engaged in wrongdoing. There were two sources that were offered for inquiry notice. The registration statements, pursuant to which the mutual funds were offered, and then a series of news articles. The registration statements didn't get the job done. The reason the registration statements did not get the job done is that they didn't give the investors sufficient information to understand the magnitude of the risk that they would pay excessive fees if they qualified for discounted front-end loan shares. Could you characterize the wrongdoing that you're talking about? Is it an omission? Is it misleading information, or all of that? It is an omission of material information that was required to make the statements made in the registration statements not misleading. That would be how I would characterize it. And I believe that that's substantially supported by the record. In terms of inquiry notice, in the Matthews case, Judge Nygaard dealt with a very similar issue, where the contention was that the plaintiff in that case, who had bought a limited partnership, was on notice because Prospectus said, well, this is a risky investment. And he looked at the case carefully and said, you know, it's true. Prospectus does say that there are these risks. But it doesn't tell you that they are of any particular magnitude. A magnitude of risk is critical in evaluating whether a particular investment is something that any individual investor wants to invest in. I'm sorry. Go ahead. I was going to ask you about the magnitude of risk. Isn't that something that really the investor, him or herself, has to assume? I mean, at some point you have to shoulder the burden of checking into the merits of a particular investment to weigh and balance all the options. Isn't that a reasonable, objective investor's responsibility? Once they have all the material information that the offeror is supposed to provide them. For example, there was a conflict of interest in the way that these transactions were structured. The brokerage firm could earn more from a commission once on a large block of back-end Class B shares than it could from a front-end loan. That was nowhere identified in the registration statement. There was nothing to tell you that, oh, I'm dealing with someone that's laboring under a conflict of interest. I should proceed with more caution. I should read with greater care. There were other problems as well. There were statements that said that the sales individuals were receiving different commissions for different mutual options. They were receiving different compensation. It didn't tell you that they would get more in particular circumstances. It didn't even tell you anything. It just said different. Isn't there an implication there that one is going to get more than another? It could relate to time. It could mean that they got less from the back-end loans than from the front-end loans. And wasn't there a hypothetical in one of the registration statements? A hypothetical investor investing $10,000 that would, over time, receive more or less given the option that that investor exercised? That's correct, Your Honor. But the problem was that when you went from the $10,000 level to the higher levels, we went from possibility into probability and into certainty. And we have different words for those for a reason. Possibility is a metaphysical event. It is possible that it will rain this afternoon or it may be sunny. A probability is something that's more likely than not. A certainty is a done deal. And our contention here is that for the people that qualify for the $100,000 discount, they were well past probability and into certainty. And that should have been highlighted in the prospectus. There were other problems as well. Well, you cite Matthews as supporting your position, but wasn't the information in that prospectus much less than the information that was in this prospectus and also in the statement of additional information? There was quite a great deal of information in that document about the different classes. But there were problems with what they said in the statement of additional information, Your Honor. For example, one of the things that they would do is they would downplay the long-term impact of higher 12B1 fees. You would be told that investing in Class B shares would put all your dollars to work. And that you may pay higher 12B1 fees over time, but they could be offset to the extent that you have gains. Well, the reality of the situation is if you're paying these 12B1 fees and you have gains on your investment, you're paying more, not less. They portrayed the choice that the investor had to make between front-end load and back-end load as something that was a matter of preference and not a matter of hard economics. The fact is that other companies were doing a better job with their prospectuses. The fact is that the defendants were selling disproportionate volumes of Class B shares, which should have said to them, Why are we selling so many of these? Why is it that so much of this is going out the door? Why aren't we selling more of the front-end load shares as well? Taken together, we submit that the registration statements were materially misleading. But didn't the statement in referencing front-end load say that for those who invested larger sums, there would be incremental reductions in the percentage? Yes, it did. Is it that sufficient to let you know that this might be a good option rather than type B bonds? It starts the process, but you have to look at the registration statement as a whole. You can't take that statement in isolation. You have to look at the statements in conjunction with the fees and say, well, this will put all your dollars to work. And yes, you will pay higher 12B1 fees, and they might cost you more, but you could offset those to the extent you have gains in the fund. And look at that through the lens of, okay, but now, as I qualify for a discount, the likelihood that I'm going to overpay is not just a likelihood. It's not a metaphysical possibility. It's a probability or it's a certainty. See, if I were an investor looking at this chart and I had over $25,000 and close to $100,000 or $500,000, as in this case, and I saw that, I would say, you know, it might be better for me to go into the type or class A fund rather than B or A or D. So let me ask a few questions before I put my money down. Isn't that what a reasonable investor would do? Well, actually, the SEC said in its promulgation of the Form M1A that precisely the point that you point to, that section of the prospectus was where it was appropriate to put a narrative highlighting the very problem we suggest, which is that as the amount you invest in Class B shares increases, the likelihood that you're going to overpay increases as well to the point where you become probably more certain. But, you know, I come back to that statement of additional information. There's a lengthy paragraph, and I won't read the whole thing, but it says it ends by saying, in addition to the ongoing Class B and Class C account, maintenance and distribution fees will cause Class B and Class C shares to have higher expense ratios, pay lower dividends, and have lower returns than the Class A and D initial sales charge shares. It's pretty explicit, isn't it? Except that it's then offset when they say to you that, yes, if you pay a front-end load, you may have longer ongoing expenses, Your Honor, but if you go to the back-end load, we'll put all your dollars to work in investment right away. To the extent that you have gains on your investment through a back-end load, it could potentially offset the amount of the 12B1 fees, so you could very well be better off. When you're told that those gains would offset the 12B1 fees when, in fact, the more you gain, the more you're paying in 12B1 fees, I think it remains problematic. And if the disclosures were so good, why were they selling such a disproportionate volume of these shares? And we've cited to you academic literature and regulatory literature over time that the bottom line is investors don't understand back-end loads, and that's been known for quite some time. And interestingly enough, it is the smart and sophisticated investor who gets fooled because he says, oh, jeez, I don't want to pay a commission. I do it this way, and as long as I hold on through the period when the back-end load falls, I'm home free. And they tell me, well, I'll pay a higher 12B1 fee, but that might be offset by my gains. I think it remains misleading. Ultimately, I can only argue, and you will decide. But to me, it's misleading. I'd like to touch briefly on a couple of other issues with respect to Center. Yeah, we'll give you some more time. We want to hear about the – there were articles in USA Today and Time and certainly the Wall Street Journal that you cite in your favor, and also actions taken by the NSAB board as well that were published. Let's go to those, because remembering that the standard that we're dealing with here is one of probability. I have a lot of difficulty looking at the USA Today and the Time magazine articles, which basically, if you boil them down, say that some brokers are cheating some clients in some concept and extrapolating from that that a reasonable investor is on inquiry notice that his or her broker cheated her on her investments. But they refer specifically to Class B funds, at least the Time article. They also give you a direct comparison to Class A funds, and that's one of the problems in this case, is that for the bulk of the class period, what was called the Class A fund at Merrill Lynch differed from everybody else's Class A. Could you comment on the sentence, if a broker tries to persuade you to buy Class B mutual fund shares instead of Class A, make sure it's in your best interest, not just his. Doesn't that put you on some sort of notice that you have to check to make sure this is what you really want to do, not what the broker wants to do? Sure, and let's say you go back to the registration statement. The first thing you'll do is you'll look at the table that says, okay, who's qualified for what shares? Class A, that's restricted. It's not available to me. You want them to make the next cognitive leap and say, oh, well, maybe Class D is what they're referring to as Class A. If it was so clear, why did they choose to reclassify the shares in April 2003? I would read that as an understanding that people were confused. The other thing that would happen is they would then pour over the statement of additional information. They would look at the point that Judge Sirica cites that say you might pay more, but they would also see the parts that I cite that say, but those higher fees could be offset over time to the extent that you have gains. And nowhere in there would they see an acknowledgment that their broker, that they were dealing with, was laboring under a conflict of interest because they could make more from selling this product to them in these circumstances. So I think that maybe that's a suspicion fact, but I don't think that's a probability fact. I don't think that's the sort of fact that I should be running downstairs with a complaint and a check to file a case. I don't think that people, when they deal with a reputable brokerage firm, have to jump to the conclusion they're being cheated. I just have one additional question because, Mr. Malone, I'm trying to figure out how much information do you really have to put out there to, I guess, answer your concern. How much information concerning risk does a broker really have to put in these things? I think that they wouldn't be here if they put a couple more sentences in their prospectus, to be frank with you, Your Honor. If they put in the prospectus a statement, in words or in substance, that for investors in back-end load shares, as the amount that you invest increases and you qualify for front-end load discounts, the likelihood that you will overpay increases as well, and eventually it will be certain that you will overpay. If they had done that, there would be no case here. In fact, if you look at what other investment companies were doing at this time, some of them had hard limits. Some of them put in their prospectus a statement that we generally won't accept an order for $100,000 or $250,000. It was known to their competitors that this was a problem, but they chose not to deal with it. The case law seems to say that inquiry notice is met if there's enough information to show a general fraudulent scheme, as opposed to the specifics that you seem to be arguing for. Is that an accurate statement of the law? It's an accurate synopsis of the law, Your Honor, but I think that the facts have to be somewhat firm-specific. If I pick up the paper today and I see that the SEC has sued Wachovia Bank for something about how it's been accounting its financial statements, that doesn't put me on inquiry notice that PNC is doing something wrong. What happens with inquiry notice is when I read in a magazine that Mary Meeker, the analyst, has engaged in some unethical business practices, I don't need to know all the scope of that to be on inquiry notice. I now know, oh, Mary Meeker, she's with this firm. She's issued analyst opinions on stocks that I bought. I'm on inquiry notice now. But to say that Wachovia doing something bad means that PNC is probably doing the same thing seems to me a stretch. I suppose you could hypothesize an article where it comes out and says the entire banking industry or brokerage industry or whatever is engaged in the following practice, which is illegal. And clearly, I think that would give anyone dealing with those industries inquiry notice. But when you're trying to go from company A to company B, I don't think it gets the job done. And I think we're supported by that in the Lentel case from the Second Circuit. And I think there's language in NAHC which is consistent with that. Mr. Malone, the NASD news release, as well as the Wall Street Journal article, specifically mentions class B shares. Why isn't that sufficient to give you inquiry notice? Well, let's talk about the NASD release first because the first one comes in April of 2001. And it involves an outfit known as Stiefel Nicholas, not Merrill Lynch. And it censures and fines a broker for sales of class B shares. What happened in that case was the fund had a $250,000 limit. The broker blew right through the limit. Now let's go back to our case. Is there a limit published in the prospectus? No. So this tells me that under this particular company's structure, this broker did something that's clearly wrong. The fund sponsor said you shouldn't do this. And the other detail that I wouldn't want to lose is you can't assume that each company's structure is like potatoes in a bin. When you look at it, if you have a chance to read about the Morgan Stanley case, what you'll learn is that the back-end loan on a Morgan Stanley fund is a little higher. It's 5%. It's 4% here. So to say that it's B, A, or N, there's more detail. You have to drill into the details of how the fees are structured. And one company's B shares do not equate with another. And one company's A shares do not necessarily equate with another. And certainly at one point, Merrill Lynch's D shares were not necessarily exactly the same as everyone else. So I really do think that it has to be something that really says to you, this is a problem. I would suggest that when you get standard reports saying, we've looked at 15,000 mutual funds around the country, and the math doesn't work for the investor, that's clearly inquiry notice. And I think that's really what triggered it here. Any further questions? Anything else you want to tell us? I probably should talk very briefly, because I alluded it to in my letter, and I made a mistake on the statute of repose. You had reserved in the Lieberman case the question of whether a claim that was extinguished under the pre-existing law before Sarbanes-Oxley was passed. On the inquiry notice standard, was revived. And the reason I raise it is just to highlight in the facts for you, I don't think it's squarely presented here. And the reason is in the chronology of events. One year before the passage of Sarbanes-Oxley is July 30th of 2001. Right before that is the Wall Street Journal article. Now if the Wall Street Journal article, as the defendants would argue, gave rise to inquiry notice, that's more than one year before Sox, but it's also more than two years from the filing of the complaint. The next significant item of inquiry notice out in the universe was an NSSD disciplinary action in February 2002, which of course would fall with less than a year before Sarbanes-Oxley went into place, and also within the two-year statute. So while it's technically in front of you in this case, it really doesn't make a difference here. I think, Mr. Malone, you received the 28-J letter concerning a case out of the Second Circuit, is that right? That would be the Smith-Barton case? I think so, it's only been in the past two years. Yes, I've seen it. It seemed at first blush that it cuts directly against you. Oh, it's just like what the district judge did here, there's no question. It is a district court case, however. Do you distinguish it off the same way that you do here? I'm not intimately familiar with the facts of the case. I've read the opinion, I know the lawyers in the case, I knew it was out there. I don't know enough factual detail about the case to draw hard lines for you between that case and this case. It's generally consistent with what brought me here today. And, excuse me, before you go, the Benzon case in the Sixth Circuit, I can't remember what you said about that. The Benzon case is really the story of bad complaints generate bad law. And when we put the Benzon case, and you'll find it in the third volume of the appendix, I believe it's 652, we put it in for a reason. It's a terrible complaint. The Benzon plaintiffs went to federal court, and what did they say? They said that we're not going to talk about what the prospectus says, we're not going to draw you through the minutia of the SAI and what they said and ask you to say, well, this is misleading because you should have said two sentences more. We're just going to say that B-shares are bad, and you had a duty to tell people that B-shares were bad. And you know what? They lost, and they deserve to lose because there's no duty to engage in self-flagellation when you're an issuer. If you say something that's accurate and it's not misleading, you don't have to go beyond it. My case here, I submit to you, is different because we've pointed to specific things that we contend are misleading and materially so. And we're not saying that they have an affirmative duty to say that these are bad for you at all times in all cases. Thank you for your time. Thank you, Mr. Greenberg. Oh, I'm sorry. Excuse me, Ms. Martin. Good morning. Good. We will give you, Greg, give her 20 minutes. We'll give you additional time if you need it. May it please the court, my name is Lori Martin. I'm with the firm Wilmer, Cutler, Pickering, Hale, and Dorr on behalf of all the defendants. But as you can see, I'm joined by a council full of firms that represent other of the defendants, and I'd like to at least introduce them. There's Mr. Dvorsky from WilmerTolls. There's my colleague, Mr. Lieberman. There is Mr. Greenbaum from Sells Cummins. And behind him, there's Mr. Angry from Brassari, Bree, and Ross. The district court held that the Merrill Lynch registration statements, coupled with news articles and NESD press releases, provided inquiry notice of the claims in this case, namely that B shares were not rational investments for investments greater than $100,000. The district court's opinion identifies information both in the prospectuses and in the public record that were in existence and knowable to plaintiffs more than two years before they brought this action. And thus, in a well-reasoned opinion, somewhat elegant, it was rightly decided he'd dismiss the action as time-barred. I'm going to address the time-barred issue alone, unless you have questions that are also presented in the briefing, but the district court's decision rests entirely on statute of limitations grounds. The issue here on appeal is whether the notice of facts should have started a reasonable investor to investigate a claim more than two years before the action was brought. There's a very straightforward application of Third Circuit precedent under BNAC and NAHC. The district court applied disclosures in the registration statements and in the public record and concluded that there were no 33 and 34 Act claims. Looking at those same types of information, the district court judge in the Citigroup case that we submitted last week also concluded that the statute of limitations would run solely on the registration statement. The Benzine case is a materiality case. It is not a statute of limitations case. But the Sixth Circuit concluded there were no material omissions, essentially on the kind of record that you have in front of you. The inquiry notice claim is fact-driven and I'm just going to highlight for you the facts that would let this investor know that the B-share investment he made might not have been appropriate for him. I'll start with the prospectus, but the court, of course, indicated that they should be read in conjunction with the public record of newspaper articles and NASD releases. The prospectus has all of the material information that any investor could look at to determine whether or not he wanted to buy a front-end load or a back-end load. How does this work, Ms. Martin? Does an investor go to Merrill Lynch and get advice, direct advice from the individual, or do you just get printed information and you make that decision yourself? You can do it in a number of ways. You can meet with your broker and discuss your personal investment with him. Merrill Lynch is not the only broker that distributes this fund, so you could meet through brokers in other ways as well. You get a prospectus where you purchase, which identifies the risk, so you could do it one of two ways, meeting with a broker through Merrill Lynch or through some other distributor. How did it happen here? Mr. Benedictus had a face-to-face meeting with the broker? He alleges he had a relationship with Merrill Lynch. He doesn't indicate what kind of relationship he had with that broker. So we don't know if he was just given printed information in the decision? We don't know based on the pleadings and the record before the court. So the information that is key, and I think you identified it in your last questions, and the district court certainly highlighted them. The prospectus has information about the up-front sales charge and identifies what those charges will be for A and D shares. Second, it has information about the fee charges for the back-end loads. B shares have up-front sales charges. A shares have a 4% load. A shares have a 5.25% load. The B share load will decline over time. It's only paid if you sell within your certain period of time. If you sell within the first year, you pay 4%. If you hold more than a year, it declines, and the prospectus tells you how it declines. It also indicates the C share back-end load charges. The prospectus defines annual fees that you pay in addition to your sales charge. B shares have a 1% 12B1 fee that's paid every year. That's in the prospectus, and the other annual fees are listed in the prospectus also. These are enough to let you know what your fees will be if you purchase, but it is not the only information that the prospectuses provide investors. The statement of additional information, which you, Judge Sirica, had read in questions to appellants, has two express disclosures. One says that B shares' annual fees may exceed sales charges. That's at Appendix 179. And second, that break points may be available for upfront charges. That's in the same location. So the statement of additional information would tell you, in addition to what your actual charges are, that you might look at other share classes  These fees are not viewed in a vacuum. The SEC mandates that you have a chart that indicates what the fees would mean for your performance for various share classes. Does Harold Lynch give investment advice? In other words, can I call and say, I have this amount of money to invest. Tell me which is the best way to go, or am I left to what the prospective says or the additional information says? It's the right observation. The broker relationship has to be determined as a suitable, give suitable recommendations. So the broker has to know an awful lot about you. What's your time horizon? How old are you? Do you want an NIRA? What's your investment objective? And that information gets factored into a discussion about what might be suitable for you. So it's a fair observation. So for me, they'd have to address middle-aged woman, 8-year-old child, husband works, retires 20 years. The prospectus will help me apply the actual charges to my personal facts, and the broker will help me do that. So the $10,000 example assumes a 5% return, lists what each of the impacted expenses would have across share classes, and you can see the impact of the expenses on each share class level, the SEC-mandated charges, and, of course, the Merrill Lynch disclosures. The only thing that plaintiff says he didn't know was that there might have been an incentive for his broker to steer him to back-ended loads. But yet again, the statement of additional information indicated that sales personnel may receive differential compensation depending on the share class that's selected. Is that explicit enough to put someone on inquiry notice? Well, it certainly is explicit enough to know that there are going to be differences in compensation and that if you care about whether your broker has an incentive to sell one share over another, that disclosure should prompt you to inquire further. Of course, the district court had before him much more information about that particular potential incentive in all of the news media, and that for the basis of the court's opinion, and perhaps this would be an opportune time to turn to those. We start with the 1998 article in the USA Today. That article has everything in it that the plaintiff in this case claims he didn't know. That is in Appendix 523. The article states, quote, the SEC is taking a closer look at sales of mutual fund Class B shares to see if brokers are keeping their clients' best interest in mind or their own. B shares have no up-front sales charge or load, but they charge higher annual fees than Class A shares. The article then states, the problem, brokers can get bigger commissions selling B shares for large purchases, even though the fund's higher annual fees hurt the investor's returns in the long run. Last, why are B shares so lucrative? Traditional front-loaded A shares offer discounts for big purchases. The article concludes B shares also typically mean lower performance in the long run, and give an example of that. And the court noted that when you purchase a mutual fund, you need to look at the information that's available in the public and put it in context. That was a well-accepted application of BNAC, and it applied in this case as well. Should he be held to knowing about those articles, even though they came out about a year before the investment decision was made? Well, perhaps a year before he invested in this particular fund, but there is ongoing information that's confirmatory of the USA Today article. I think that's general business information. It's not company-specific. It's the kind of information that's available to reasonable investors generally. But if you push the USA Today article aside and claimed you had never seen it, you would still have the Time magazine article that said B shares generate lower returns than A shares, and the SEC is investigating whether brokers are selling B shares to get fattened commissions. Following the notice of the SEC's investigation, the NASD releases a number of actions involving broker-dealers in which it appears that they are selling B shares when A shares would have been more suitable. So in connection with the disclosures of actual costs in the prospectus and the statement of additional information, the public record is very clear that there may be reasons that you don't want to be in B shares. We don't know if Mr. Benedictus shouldn't have been in B shares. All we know is that he had a very large investment and that he now claims he would have purchased a different investment had he known that they were economically not rational. The article plaintiff concedes prompted the running of the statute of limitations has no more information in it than was already available in the prospectus, the NASD releases, the Time magazine article, and then I will turn last to the Wall Street Journal article. The S&P article indicated that S&P had reviewed the performance of multi-share classes of mutual funds that class B shares outperformed A shares, underperformed A shares in the long term and underperformed class C shares in the short term. Of course, the obverse of that is that B shares outperformed C shares in the short term and B shares outperformed the A shares in the short term and they outperformed C shares in the long term. They've only identified a particular part in time. There's nothing in the article, however, about differential compensation that is in the statement of additional information. So the information in this article that plaintiff said prompted the running of the statute of limitations was understood in the prospectus and in the public record. I now turn to the Wall Street Journal article, which is the article that plaintiffs maintain molded them into a sense that there were no problems with B shares at Merrill Lynch. In that article, in fact, the reverse is true. There's a statement that suitability is a concern. Merrill Lynch spokesman says, quote, There is at least an implicit suggestion that other firms are doing more than Merrill Lynch, that Prudential was capping the dollar amount that one could invest in B shares. Merrill Lynch was saying it was not going to do that. There is nothing in this article that should lull a reasonable investor into thinking that share class suitability isn't an issue. This is not a Daimler-Chrysler situation where management is constantly reaffirming that they were having a merger of equals. That newspaper article, I think, simply highlights that share classes could be a source of concern. I last want to address the comment that Appelant makes about magnitude of risk. This case is not a Matthews case. This is not a laundry list of potential risks that could cause you to lose money and no indication as to which risks are likely. This is a case about disclosed facts underlying the expenses and fees of share classes and mutual funds. There is nothing about the plain description of the facts that is subject to a magnitude analysis as suggested by Matthews. The district court rightly decided this case on statute of limitations grounds and should be affirmed. If you want to reach further than that, the Benzon court reached the materiality judgment and said there were no facts that were omitted from the prospectuses. They set out the same disclosures that are highlighted in the statute of limitations analysis for the prospectus and as an independent ground to support the district court's decision. Thank you. Thank you very much, Mr. Morgan. Mr. Malone. Thank you, Your Honor. Let's go back to the Wall Street Journal article for a second because I think that's important because it's the only article in this record that has the words Merrill Lynch in it. What it says is most brokerage firms, including Merrill Lynch, Morgan Stanley, and Edward D. Jones, don't specifically cap sales of B-share mutual funds. Merrill, the nation's largest brokerage firm in terms of registered representatives, handles such issues through broker training and education. Quote, we continue to take suitability issues very seriously. Now, I have a hard time looking at that statement and saying that a reasonable person listening to that is going to conclude that there's a probability that that's a lie and that he's been defrauded. What it says is a lot of big firms don't cap them. They handle it through training. That's why you deal with a reputable firm. So I don't think that that article gets them where they want to go. You did mention that it would cause you to believe that you had a claim in this case with the Standard & Poor's article that revealed certain information. I think that's the earliest fact that you can point to that takes it out of this brokerage firm here, this brokerage firm there, this one calls them A, this one calls them D, this one calls them alphabet soup. But what was in that article that had not been disclosed in previous public articles? It took it from the individual case, the hypothetical I gave you before of Wachovia, and turned it into the banking industry, or in this case the brokerage industry. It gave the investor a reason to stop and say, whoa, wait a minute, this isn't just some little firm I've never heard of where the broker blew through the limit that was published in the prospectus. This is a problem that's widespread, systemic, and you know what? It probably does affect me and I've got to look at that. The thing that's interesting to me is if the facts were out there in 1998, where were the lawsuits over this? There were none. And that's because there weren't enough facts to generate a case. There weren't enough facts to tie Merrill Lynch or Morgan Stanley to particular wrongdoing. Thank you for being very patient with me. Thank you very much. We're going to ask the parties to arrange for a written transcript of the argument and to share the costs, and if you would kindly check with the clerk's office before you leave. They will tell you how to do that. The case was very well argued on both sides. We will take the matter under advisement. We thank counsel for excellent briefs and excellent argument.